IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAROLYN DICKS-KEE,<br><br>            Plaintiff,<br><br>    v.<br><br>THE NEW JERSEY JUDICIARY,<br><br>            Defendant. | HONORABLE JEROME B. SIMANDLE<br><br>Civil No. 12-6620 (JBS/JS)<br><br><br>**OPINION** |

APPEARANCES:

F. Michael Daily, Jr.
Attorney at Law
Sentry Office Plaza, Suite 100
216 Haddon Avenue
Westmont, NJ 08108
    Attorney for the Plaintiff

John F. Hoffman
Acting Attorney General of New Jersey
    By: Eric S. Pasternack
    Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625-0112
    Attorneys for Defendant

**SIMANDLE**, Chief Judge:

## I.    INTRODUCTION

This matter comes before the Court on a motion for summary

judgment by the defendant, the New Jersey Judiciary [Docket Item

19]. The plaintiff, Carolyn Dicks-Kee alleges that the

defendant, in violation of Title VII's antiretaliation

provision, 42 U.S.C. § 2003e-3(a), took various adverse actions against her for assisting in another employee's Title VII discrimination case. The defendant argues that the actions, namely increased hostility from the plaintiff's supervisor, unauthorized intrusions into the plaintiff's work space, and denial of the plaintiff's furlough and sick leave requests, were not "materially adverse." The defendant also argues that the factual evidence demonstrates that the actions taken against the plaintiff were not due to the plaintiff's participation in Title VII-protected activity. For the reasons set forth below, the Court will grant defendant's motion for summary judgment.

## II.  SUMMARY JUDGMENT RECORD

The Court begins with the summary judgment record. The facts in the record are largely undisputed.

The plaintiff, Carolyn Dicks-Kee, is a Financial Specialist employed by the New Jersey Judiciary, Camden Vicinage. She has worked in various divisions of the Camden Vicinage since 1993, and has worked in the Finance Division since March of 2000. (Def. Statement of Material Facts ("SMF") [Docket Item 19-22] ¶ 1-4.)

Shortly after the plaintiff transferred to the Finance Division, a new Finance Division Manager was hired. The new manager, Peter Cupo, directly supervised Flavia Stovall, who was

the plaintiff's supervisor. Cupo also supervised Jeffrey Wiesemann, who later became the plaintiff's supervisor in 2002 after Stovall was transferred to another division. (SMF ¶¶ 5-10.)

Cupo was the plaintiff's boss in the Finance Division until August 2011, when he moved to Trenton for a position in the Superior Court. (Dep. of Peter Cupo ("Cupo Dep."), Ex. B [Docket Item 19-3], at 55:11-12.) Their relationship was rocky from the start. When Cupo began, he had one-on-one meetings with individual staff members in order to introduce himself and get to know them. (Cupo Dep., at 60:9-12.) When Cupo failed to meet with the plaintiff, she was "offended." (Dep. of Carolyn Dicks-Kee ("Dicks-Kee Dep."), Ex. A [Docket Item 19-2], at 27:13-25; 39:6-10; 58:16-24.)

The plaintiff did not think Cupo treated her with respect. (SMF ¶ 70; Dicks-Kee Dep., at 59:22-60:3.) Cupo talked down to the plaintiff and ostracized her. (Dicks-Kee Dep., at 76:19-77:12; 83:14-84:9.) He was also sometimes dismissive of the plaintiff. He would "walk away, turn his back," not answer her, and "several times" a year, not respond to her email. (SMF ¶ 86; Dicks-Kee Dep. at 80:12-24.) Also beginning around 2001, about once or twice a month, Cupo would interrupt the plaintiff while she was on the telephone, interrupt conversations between the

3

plaintiff and her co-workers, and intrude into her office unannounced. (SMF ¶¶ 50-52, 81; Dicks-Kee Dep., at 46:15-49:12; 71:15-76:18.) Starting from the very beginning, Cupo also yelled at the plaintiff "[a] couple of times a month." (SMF ¶ 79; Dicks-Kee Dep., at 63:6-64:12.) At deposition, the plaintiff repeatedly stated that Cupo was unprofessional and impolite. She recalled that he once yelled at her when they disagreed over how she should record overtime for employees. (SMF ¶ 78; Dicks-Kee Dep., at 63:8-13.) She also testified that Cupo would tell her during a meeting to do something, "just because I said so." (Dicks-Kee Dep., at 62:15-18.) When asked how Cupo would "humiliate" her, the plaintiff recalled an incident between 2001 and 2003 where Cupo refused to allow her to subscribe to the Journal of Accountants for work. (SMF ¶ 85; Dicks-Kee Dep., at 77:21-78:23.) She also remembered that once, sometime between 2000 and 2005, Cupo denied her request for twelve mechanical pencils, saying that she could only order six. (Id. at 79:7-23.) According to the plaintiff, Cupo's bad behavior was "continuous" and "ongoing" throughout the time that he was Finance Division Manager. (Id. at 59:22-60:3; 67:14-21.) The plaintiff repeatedly described Cupo's actions as "unprofessional," "impolite," "not courteous," "inappropriate," and "offensive," and "abusive." (SMF ¶¶ 52, 70, 72, 76, 80; Dicks-Kee Dep., at 46:18; 58:21;

4

61:4; 62:2; 70:17-21; 71:23.)

At deposition, the plaintiff testified that her desk had been broken into and her computer files tampered with on numerous occasions. The problems began in 2001, around the time when Cupo took over the Finance Division, and stopped in 2011, when Cupo left. (SMF ¶ 28; Dicks-Kee Dep., at 42:19-43:22; 87:7-10; 88:15-89:5.) The plaintiff stated that her computer files were "corrupted" or tampered with at least once a week, and physical papers on her desk would occasionally be displaced or "disrupted." (SMF ¶ 30; Dicks-Kee Dep., at 87:21-23; 88:15-22.) She believed that Cupo was the one who tampered with her files because she "never had an issue before" he became manager, although she did not have any direct evidence to prove that he did it. (SMF ¶ 31-32; Dicks-Kee Dep., at 43:23-25.)

On November 28, 2006, Flavias Stovall, the plaintiff's former supervisor, filed a lawsuit in federal district court alleging race and gender discrimination and harassment by her supervisors at the New Jersey Judiciary, Camden Vicinage. Cupo and Wiesemann were named as defendants, among several others. (SMF ¶ 61; Stovall Compl. [Docket Item 19-6.], Ex. C.)[1] The

---

[1] The case eventually settled on March 25, 2010. (Pl. Supp. Statement of Material Facts ("Supp. SMF") [Docket Item 24-2] ¶ 17; Decl. of Flavia Stovall ("Stovall Decl.") [Docket Item 24-3] ¶ 26.)

plaintiff became involved in the litigation as the case
proceeded. She signed an affidavit dated August 20, 2008
describing Cupo's behavior towards her and stated that his
conduct towards her was "offensive, unprofessional and hostile."
(Aff. of Carolyn M. Dicks-Kee ("Dicks-Kee Aff.") [Docket Item
19-7], Ex. D, ¶ 17.)

In addition to making an affidavit, the plaintiff
participated in a deposition in connection with the Stovall case
on October 8, 2008. (SMF ¶ 69.) At the time, James Grazioli was
the Human Resources Manager. (Dep. of James Grazioli ("Grazioli
Dep.") [Docket Item 19-3], Ex. B, at 7:1-14.) Grazioli, who was
not named as a defendant in the Stovall case, testified at
deposition that he was "normally" contacted about discrimination
complaints "at the beginning stage." (Grazioli Dep., at 10:9-
11). Wiesemann, the plaintiff's supervisor who replaced Stovall
in 2002, was aware of the discrimination suit that Stovall had
filed because he received a copy of the complaint. Wiesemann did
not recall if he was aware that the plaintiff had been deposed
in that case at the time, but knew that she had been deposed
when he found out that she had filed a complaint of retaliation.
(SMF ¶ 64-67; Wiesemann Dep., at 114:1-14.)

The plaintiff alleges that her supervisors retaliated
against her in several ways because she assisted Stovall's

6

discrimination case against Cupo, Wiesemann, and others. According to the plaintiff, there was a "pre-existing strained work environment" even before she participated in the Stovall suit. (Pl. Supp. Statement of Material Facts ("Supp. SMF") [Docket Item 24-2] ¶ 4.) The strained work environment was largely due to Cupo's treatment of female African-American employees in the Division. (Id.) Although Cupo was already treating the plaintiff poorly, the plaintiff testified that Cupo's already hostile attitude towards her "became worse" and the poor treatment "more frequent" after she signed an affidavit describing Cupo's behavior towards her. (Supp. SMF ¶ 16; Dicks-Kee Dep., at 100:15; 105:5-10.)

In addition, the plaintiff discovered that someone had gone into her cubicle and disturbed her files several times in the summer and fall of 2008. The first incident occurred in June 2008, two months before she signed the affidavit for Stovall. On June 17, the plaintiff arrived at work in the morning to discover that "[t]he right desk drawer was unlocked, the chair was away from the desk, and one of the boxes containing the Title IV-D Reports and working papers for the months of April 2008 and May 2008 had been rummaged through." (SMF ¶ 34; June 17, 2008 Email from Dicks-Kee, Ex. E [Docket Item 19-8], at 1.) The plaintiff sent an email to Cupo and Wiesemann, and Cupo

wrote back saying that it was him. (SMF ¶ 36; Ex. E, at 1.) He testified that he had been looking for a Title IV-D report, which Dicks-Kee was responsible for preparing. He found the report in the top box of a stack of boxes next to her cubicle and took the report. (SMF ¶ 37; Cupo Dep. 64:15-23.) Cupo testified, "I was going there specifically to get the cost allocation report, which is part of the IV-D report. And I looked in the box, I got it and that was it." (Cupo Dep. 77:16-19.)

Two months later, on August 17, 2008, the plaintiff arrived at work to find that her cubicle was not how she left it. In an email to Cupo and Wiesemann, she described how she found her desk drawer unlocked and a file box containing Title IV-D reports lying open with the lid off, with "related emails laying on top of the box lid." (Aug. 18, 2008 Email from Dicks-Kee, Ex. F [Docket Item 19-9], at 2.) Wiesemann emailed back saying that he had not been in her work area and that Cupo was out of the office on Friday. (SMF ¶ 44; Ex. F, at 1; Wiesemann Dep., at 121:20-23.)

The plaintiff discovered that her cubicle area had been disturbed again on November 3, 2008. She promptly emailed Cupo and Wiesemann, noting that "the right overhead storage area [was] ajar/partially opened and the right desk drawer [was]

8

unlocked." (SMF ¶ 46; Nov. 3, 2008 Email from Dicks-Kee, Ex. G [Docket Item 19-10], at 2.) Wiesemann responded, "I guess you should fill out a report with security." (Ex. G, at 2.)

The record indicates that one more incident occurred on September 15, 2009, nearly one year later. That day, the plaintiff saved an email to file describing how she came to work and found the locked areas in her cubicle unlocked. (SMF ¶ 48; Sep. 15, 2009 Email from Dicks-Kee, Ex. H, at 1.)

The plaintiff believed that Cupo was the one who was looking through her desk, "[b]ecause I don't know anyone else who would want to go into my desk." (SMF ¶ 32; Dicks-Kee Dep., at 96:6-9.) She didn't know what Cupo was looking for when he went into her office space without her present but speculated that he went in "[t]o either get whatever he was looking for, to take papers, I don't know, he never said why." (SMF ¶ 33; Dicks-Kee Dep., at 96:12-16.)

Wiesemann testified that he had never gone through the plaintiff's desk. (Wiesemann Dep. 123:3-5.) He was not aware of any other employees complaining about their work space being disturbed. (Id., at 120:3-6.) Cupo only recalled going into the plaintiff's cubicle to take some reports once, on June 17, 2008. (SMF ¶¶ 36-37.) With respect to the other incidents of disturbance, he speculated that "[i]t may have been

9

carelessness" because the plaintiff may have forgotten to lock her desk at night and then "assumed it was broken into." (SMF ¶ 41; Cupo Dep., at 88:9-12.) Cupo did not recall ever seeing damage to the desk. (SMF ¶ 41; Cupo Dep., at 88:8-9.) No one else had complained to Cupo about unauthorized access to their computer. (Cupo Dep., at 71:10-12.)

The plaintiff also asserts that Grazioli and Wiesemann retaliated against her by denying her sick leave injury reimbursement request and her voluntary furlough request. Shortly before the plaintiff began assisting with Stovall's discrimination case in August 2008, she applied for reimbursement for Sick Leave Injury benefits from her employer. (SMF ¶ 128.) At the time, New Jersey's sick leave provision entitled an employee who became disabled due to a work-related injury to be paid for the time he or she missed work because of the injury. N.J.A.C. § 4A:6-1.6(b) (2008). To qualify for sick leave injury benefits, the provision required the employee's disability to be "due to an injury or illness resulting from the employment." Id. § 4A:6-1.6(c).

Four years earlier, the plaintiff had suffered a heart attack while coming to work in July 2004, and had missed over three months of work. She filed a claim for Worker's Compensation shortly after her heart attack, alleging that the

heart attack had been brought on by stress from her job. (SMF ¶ 115; Dicks-Kee Dep., at 129:22-25.) Although her claim was initially denied by a Principal Claims Investigator, the case was ultimately settled in May 2008, with the plaintiff receiving a partial disability award of $55,713.00. (SMF ¶¶ 119-123; Order Approving Worker's Compensation Settlement ("Settlement Order") [Docket Item 19-15], Ex. L.)

The plaintiff filed a request for reimbursement for sick leave injury benefits in June 2008, soon after her Worker's Compensation case settled. (SMF ¶ 128; Op. on Sick Leave Injury Appeal, Civil Service Comm. ("SLI Appeal Op.") [Docket Item 19-18], Ex. O, at 3.) She believed that she was entitled to sick leave injury payments because "it was determined that it was a workers' comp. issue." (SMF ¶ 129; Dicks-Kee Dep., at 143:23-144:5.) The plaintiff gave her reimbursement request to an administrative specialist in Human Resources, Patricia Ernst. The two of them "kept communicating back and forth via email, via telephone" about the request, a process which "went on for over a year." (Dicks-Kee Dep., at 148:4-149:1.) When it still was not resolved, James Grazioli, the Human Resources Manager, was copied on one of the emails. (Id.) Shortly after that, in a letter dated June 2, 2009, Grazioli denied the request. (SMF ¶ 133; June 2, 2009 Letter Denying SLI Request [Docket Item 19-

11

16], Ex. M.)

Grazioli testified at deposition that he did not think the plaintiff was entitled to SLI benefits because her doctor's reports indicated that she had a "preexisting illness." (SMF ¶ 135; Grazioli Dep., at 42:22-25.) He stated that "[a]n example would be, if a person had any kind of heart issues or heart problems or stress problems or anything, then that would be considered, in my opinion, a preexisting illness." (Grazioli Dep., at 43:4-7.)

The plaintiff appealed the denial of her request to the Civil Service Commission. Grazioli submitted a response to the appeal in a letter dated September 4, 2009, over a year after he had written the first denial letter (SMF ¶ 145; Sept. 4, 2009 Grazioli Letter re: SLI Appeal [Docket Item 19-17], Ex. N.) Grazioli included two doctor's reports with the letter. In the first, the plaintiff's physician, Dr. Nicholas L. DePace, had written, "I can state with a reasonable degree of medical probability that this patient's myocardial infarction on 7/8/04 was precipitated by acute stress at the workplace." (SMF ¶ 152; Ex. N, at 6.) In the second letter, Dr. Arnold B. Meshkov, the State's physician, had concluded, "Based upon my review of the records, interview and examination of Mrs. Dicks-Kee, I do not feel that her employment had a significant causal relationship

12

with her coronary artery disease and subsequent myocardial infarction." (SMF ¶ 148; Ex. N, at 9.) Grazioli wrote to the Commission that the plaintiff was not qualified for SLI benefits because she "had a preexisting condition, and there is no medical documentation that clearly established the injury was work-related." (SMF ¶ 153; Ex. N, at 2.)

On January 14, 2010, the Civil Service Commission reversed Grazioli's determination. The Commission placed greater weight on Dr. DePace's medical report, and stated that the request should not have been denied because the Worker's Compensation proceeding had deemed her injury work-related. (SMF ¶ 155; SLI Appeal Op., at 3.) A few days after the reversal, Grazioli sent an email instructing that Dicks-Kee be reimbursed for SLI benefits for the period she missed work, and Dicks-Kee received payment. (SMF ¶¶ 156-157; Jan. 20, 2010 Grazioli Email Regarding SLI Benefits [Docket Item 19-19], Ex. P; Dicks-Kee Dep. 154:22-155:3.)

The plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging unlawful retaliation, which was received on March 29, 2010. (EEOC Notice of Charge of Discrimination [Docket Item 19-20], Ex. Q.) In an attached Statement of Particulars, the plaintiff stated that three things occurred after she began to participate in the Stovall

13

litigation: Cupo and Wiesemann treated her with hostility and condescension; her desk was broken into; and Grazioli denied her request for sick leave injury payments. (Ex. Q, at 4.)

Later that year, in July of 2010, the plaintiff submitted two requests for a voluntary furlough in order to take care of her ailing mother. The first request was for a 28-day period from August 2 to August 31, and the second request was for a 28-day period "intermittently" from August through the end of December. (SMF ¶¶ 90-91, 93.) Wiesemann denied the first request because she "could call out for all of those days." (SMF ¶ 92; Aug. 11, 2010 Email from Dicks-Kee [Docket Item 19-12], Ex. I, at 1.) By letter dated August 5, 2010, Wieseman denied the plaintiff's second request "due to the operational needs of the Finance Division." The letter also stated, "In the future, if you are able to provide us with specific dates, please feel free to resubmit your request for consideration." (SMF ¶¶ 94-97; Ex. I, at 5.)

Wiesemann testified that the furlough policy had changed just a month or two earlier. Previously, employees were allowed to submit furlough requests without supplying in advance the exact dates they were going to be out. Now, however, they now needed to specify all the dates they were requesting. (SMF ¶ 102; Wiesemann Dep., at 126:23-127:4; 129:5-10.) According to

14

Wiesemann, this was because "we wanted to make sure we had our operational needs covered, and wanted employees to request specific dates for voluntary furlough, so we didn't have everybody calling out the same day voluntary furlough, and thus having no office coverage." (SMF ¶ 103; Wiesemann Dep., at 129:16-20.) Cupo also testified that the plaintiff's request was denied "because it was not date specific." (Cupo Dep., 95:14.) He stated that if the plaintiff "were to have put specific dates in [her request], then . . . we would have been able to restructure our office to accommodate that." (SMF ¶ 98; Cupo Dep., at 96:2-4.)

On January 3, 2012, the EEOC issued a right to sue letter to the plaintiff. (EEOC Dismissal and Notice of Rights Letter, Ex. R.) The plaintiff filed this suit on October 19, 2012, alleging that her employer, the New Jersey Judiciary, violated the antiretaliation provision of Title VII.

## III. STANDARD OF REVIEW

The defendant, as the party moving for summary judgment, must show that there are no issues of material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323

15

(1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, here the plaintiff, to demonstrate specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The Court must review the facts and draw all inferences in light most favorable to the non-moving party, which in this case is Plaintiff Carolyn Dicks-Kee. Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

The question on summary judgment is whether the evidence presents "sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. If a fair-minded jury could return a verdict for the non-moving plaintiff on the evidence presented, summary judgment will be denied. If the plaintiff fails to make a showing sufficient to establish an essential element of her case, for which she bears the burden of proof at trial, summary judgment will be granted. Celotex, 477 U.S. at 322-23.

## IV.  DISCUSSION

### A. Retaliation Under Title VII

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual based on that person's "race, color, religion, sex, or national origin." 42

16

U.S.C. § 2000e-2(a). The antiretaliation provision of Title VII also forbids employer actions that "discriminate against" an employee because that employee has "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. Id. § 2000e-3(a).

To show that an employer has violated the antiretaliation provision of Title VII, a plaintiff must first establish a prima facie case of retaliation. The plaintiff must show that (1) she was engaged in protected activity; (2) she was subject to a materially adverse employment action; and (3) there is a casual link between the protected activity and the subsequent adverse job action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006); Sarullo v. U.S. Postal Service, 352 F.3d 789, 800 (3d Cir. 2003) (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)).

To establish the second element of the prima facie case, a plaintiff must show that a "reasonable employee would have found the challenged action materially adverse," in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations and citation omitted). The third element of the prima facie case

17

requires the plaintiff to show a causal connection between his or her participation in proceedings against unlawful discrimination and the employer's adverse action. "Many may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." Moore, 461 F.3d at 342 (quoting Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)). Because the "ultimate question" in a retaliation claim is the "intent to retaliate vel non," the inquiry "identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus." Id. (quoting Jensen, 435 F.3d at 449-50 and n.2).

Once the plaintiff establishes a prima facie case of retaliation, the defendant must set forth a legitimate, non-retaliatory reason for its conduct. The plaintiff must then show that the employer's proffered explanation was pretext, and that retaliation was the real reason for the adverse employment action. Moore, 461 F.3d at 342. To survive summary judgment, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions. Fuentes v. Perskie, 32 F.3d at 759, 764 (3d Cir. 1994).

### B. Defendant's Motion for Summary Judgment

The defendant does not dispute that the plaintiff has

18

engaged in protected activity by participating in Stovall's discrimination case. However, the defendant argues that summary judgment should be granted because the plaintiff cannot establish the second or third prong of the prima facie case of retaliation. Their argument is that none of the actions taken against the plaintiff rise to the level of being "materially adverse," and that no reasonable juror could find that the complained-of actions were taken because of the plaintiff's participation in the Stovall suit. Furthermore, the defendant argues that Cupo had a legitimate reason for searching the plaintiff's cubicle and interrupting her conversations; and that Grazioli and Wiesemann had legitimate reasons for denying her requests for sick leave injury reimbursement and voluntary furlough. The defendant finally argues that the denial of plaintiff's voluntary furlough requests should be excluded from consideration altogether because it was not part of her EEOC complaint.

The plaintiff argues that while the defendant's actions individually may not be materially adverse, the conduct viewed as a whole was materially adverse and satisfies the second prong of the prima facie case. The plaintiff also contends that the defendant's "long pattern" of hostility against the plaintiff, combined with an increase in hostility after the plaintiff's

19

participation in the Stovall suit, provides a causal link
between her protected activity and the adverse action. With
respect to the denial of voluntary furlough, the plaintiff
argues that new actions which occur during the pendency of
proceedings before the EEO Commission may be included in the
civil case. Finally, the plaintiff argues that the defendant's
reasons for denying her furlough and reimbursement requests were
not credible because she was plainly entitled to sick leave
injury benefits, and because defendant's policy of requiring
specific furlough dates in advance did not make sense in the
context of the plaintiff's job duties.

**C. Analysis**

The Court agrees with the defendant that based on the
summary judgment record, the plaintiff cannot establish a prima
facie case of discrimination. Although a reasonable factfinder
would be able to conclude that the plaintiff was subject to a
materially adverse action, the evidence is insufficient to show
that the plaintiff's employer took these actions because of the
plaintiff's participation in Stovall's Title VII case. The
plaintiff asserts that the following acts were retaliatory: Cupo
and Wiesemann routinely treating her with hostility and "in an
utterly demeaning fashion"; Cupo searching her work space
without her authorization; Grazioli denying her request for sick

20

leave injury benefits; and Wiesemann denying her furlough requests. The Court will address each act in turn.

### 1. Comparison of Cupo's treatment before and after Plaintiff's protected activity

The plaintiff asserts that Cupo had always treated her with hostility, condescension, and disrespect. (Pl. Brief in Op. to Mot. to Dismiss ("Pl. Brief") 7.)[2] Plaintiff's own testimony is evidence that Cupo would routinely yell at the plaintiff, interrupt her conversations, barge into her office unannounced, talk down to her, and act dismissively towards her. Cupo's attitude towards the plaintiff began in 2001 and continued after she began assisting in the Stovall case. The plaintiff repeatedly described such actions as "unprofessional," "impolite," "not courteous," and "inappropriate," as discussed above.

In <u>Burlington Northern</u>, the Supreme Court explained that a "materially adverse" action that could dissuade a reasonable employee from engaging in Title VII-protected conduct is "not limited to discriminatory actions that affect the terms and

---

[2] The Court notes that there are no specific dates attached to Cupo's conduct. Defendant characterizes Cupo's behavior as beginning in 2001 and continuing until he transferred out of the Camden Vicinage in 2011, which plaintiff does not dispute. The Court will therefore assume that Cupo's behavior continued after the plaintiff began participating in the Stovall litigation.

conditions of employment." 548 U.S. 53, 64 (2006). However, the
Court and this Circuit have also cautioned the importance of
"'separat[ing] significant from trivial harms'" because Title
VII "'does not mandate a happy workplace'" and does not immunize
employees reporting discrimination from petty slights, minor
annoyances, and simple lack of good manners. Moore v. City of
Philadelphia, 461 F.3d 331, 346 (3d Cir. 2006) (quoting
Burlington, 548 U.S. at 68 and Jensen v. Potter, 435 F.3d 444,
451 (3d Cir. 2006)).

Although the Court recognizes that Cupo's behavior towards
the plaintiff caused her distress, it does not necessarily
follow that that such treatment was "materially adverse" for the
purpose of a Title VII retaliation claim. The plaintiff asserts
that Cupo was offensive, abusive, and hostile towards her, but
the examples she provides are that he interrupted her while she
was on the phone or talking to co-workers, talked down to her,
raised his voice, and was dismissive of her when he sometimes
failed to respond to her emails. The plaintiff stated that Cupo
humiliated her when he refused to allow her to subscribe to the
Journal of Accountants for work. She also stated that Cupo was
unprofessional when he ordered her to do something without any
explanation "because [he] said so." (Dicks-Kee Dep. 62:15-18.)
On the spectrum of behavior, such conduct falls more into the

22

category of a "lack of good manners," which, by itself, is not enough to constitute a "materially adverse" act. Burlington, 548 U.S. at 68. The plaintiff's repeated use of the words "impolite," "unprofessional," and other words along those lines to describe Cupo's behavior further supports a conclusion that the complained-of behavior described workplace incivility rather than conduct that would dissuade reasonable employee from supporting a discrimination claim. See Somoza v. Univ. of Denver, 513 F.3d 1206, 1214-15 (10th Cir. 2008) (being subject to ridicule and comments during a public departmental meeting did not rise to the level of a materially adverse action); McKinnon v. Gonzales, 642 F. Supp. 2d 410, 428 (D.N.J. 2009) (Simandle, J.) (noting that "courts have consistently found that an employee's perception that he has been micro-managed, criticized, or scrutinized by his supervisor fails to rise to the level of 'material adversity.'" (citation omitted)).[3]

The intrusions into plaintiff's desk and files present a closer question. The plaintiff reported that her desk had been disturbed in June, August, and September, all around the time

---

[3] The plaintiff argues that Wiesemann also treated the plaintiff with hostility; however, she offers no citations in support of this claim. (Pl. Br. 9.) Wiesemann's denial of the plaintiff's requests for voluntary furlough with indefinite dates will be discussed below.

she signed an affidavit for Stovall and shortly before she participated in a deposition. The fourth incident occurred in September of 2009, approximately a year later. However, two of the three incidents in 2008 occurred before the plaintiff signed the Stovall affidavit on August 20, 2008. The plaintiff believes that Cupo was responsible for all four incidents, but there is no evidence in the record to support her suspicion. Cupo admitted to the first incident only, but stated that he only took a file from a box and did not go through her desk. Wiesemann told the plaintiff that Cupo had been out of the office when the second incident occurred in August. Cupo and Wiesemann stated that no other employee had complained of any unauthorized break-ins. Moreover, Cupo testified that he never observed any signs of tampering or physical damage to the plaintiff's desk or lock. He also stated that only plaintiff had keys to her desk, and she may have accidentally left her desk drawer unlocked. Giving plaintiff the benefit of reasonable inferences from these disputed facts of Cupo's involvement in the disturbance of her desk and work papers, it is conceivable a reasonable juror could find circumstantial evidence of Cupo's conduct and that it was directed toward her.

The Court, drawing all reasonable inferences in light most favorable to the plaintiff, assumes that the intrusions into the

plaintiff's desk after August 20, 2008 may constitute materially adverse conduct. A reasonable employee might well find repeated disturbances of her work papers in her locked desk to be a serious invasion of privacy. While a juror could also reasonably find that these intrusions did not occur or that they occurred and were related only to legitimate workplace purposes of locating financial reports, the evidence is in dispute. Particularly when the employee is supporting a charge of discrimination against a supervisor, any unauthorized disturbance of her files may be seen as an intimidation tactic and may cause the employee to rethink her participation in a case.

Based on the summary judgment record, however, no reasonable juror would be able to find a causal link between the protected activity and adverse conduct. The Court considers a "broad array of evidence" in determining whether there is a causal link to satisfy the third element of the prima facie case. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000). Where the temporal proximity between the protected activity and the adverse action is "unusually suggestive," it may be sufficient by itself to create an inference of causality. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d

25

Cir. 1997)). If there is no very close temporal proximity between the protected activity and allegedly retaliatory conduct, the Court will look to the intervening period for other evidence of retaliatory animus, such as a "pattern of antagonism" following the protected conduct. The question is whether "the proffered evidence, looked at as a whole, may suffice to raise the inference" of retaliation. LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) (citing Farrell, 206 F.3d at 280); Krouse, 126 F.3d at 503-04.

There is insufficient evidence in the record to show that the adverse conduct was linked to the plaintiff's participation in the Stovall case, because nothing in the record suggests that her participation brought about a qualitative change in how the plaintiff was treated. Both parties agree that Cupo treated the plaintiff poorly from the very beginning and continued to do so until 2011, when he left his position in Camden. The plaintiff herself argues that "Cupo as early as when he first came into contact with the plaintiff had a bias against her and tried to set her up to fail . . . ." (Pl. Brief 10.) At deposition, the plaintiff testified that since 2001, Cupo had regularly yelled at her, interrupted her conversations with co-workers, interrupted her while she was on the telephone, and was

26

dismissive of her. He had also long "offended" and "humiliated" the plaintiff when, for example, he met with each staff member individually except for her and reduced her order for a dozen mechanical pencils to a half-dozen sometime between 2000 and 2005. Tampering of the plaintiff's work files had also been occurring with some regularity long before the plaintiff's participation in the Stovall suit. The plaintiff testified that the intrusions into her desk and computer files began in 2001, and the intrusions into her computer files occurred "a couple of times a month," or sometimes "several times during the week" "continuous[ly]" until 2011. (Dicks-Kee Dep. 43:8-22, 87:21-23.)

The plaintiff argues that Cupo's hostility towards her was "much more severe" and that the intrusions into her work space were greater in scope following her participation in the Stovall suit. (Pl. Br. 2-3.) But plaintiff's citations provide little evidentiary support for these statements. Plaintiff's citation to the Stovall affidavit, which described a deteriorating work environment following Stovall's settlement, sheds no light on whether and how Cupo's behavior towards the plaintiff had deteriorated. While the plaintiff offered her opinion at deposition that Cupo's poor treatment "became worse" and "more frequent" after her protected activity (Dicks-Kee Dep. 100:15, 105:10), she provided no basis for her statement. Nor can the

27

Court can find anything in the record to suggest that she experienced more invasive break-ins to her work space.[4] The Court will therefore not give weight to the plaintiff's opinion of worse differential treatment because it is unsupported by any evidence.

Because the evidence does not show that the plaintiff suffered any worse treatment following her protected activity, the plaintiff cannot meet the third prong of the prima facie case and her retaliation claim fails. See LeBoon, 503 F.3d 217, 233-34 (3d Cir. 2007) (evidence insufficient to show causation where evidence shows that plaintiff had difficulties with her supervisor "almost immediately" upon her supervisor's appointment as Executive Director and events after the plaintiff's protected activity do not show a qualitatively different relationship).

---

[4] The Court takes note of the fact that the November 3, 2008 desk intrusion occurred two and a half months after the plaintiff signed an affidavit in the Stovall case and one month after she participated in a deposition. Although the timing is suggestive, the same sort of conduct had occurred on multiple occasions before the protected activity. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001). Absent other evidence linking these events to the plaintiff's protected activity, timing alone does not establish causation.

28

There is an additional reason why the causation prong
cannot be met. To show that an employee's protected activity was
a motivating factor behind a supervisor's conduct, the employee
must "show as well that the [supervisor] had knowledge of the
protected activity." Moore v. City of Philadelphia, 461 F.3d at
351. Nothing in the record suggests that Cupo was even aware of
the plaintiff's participation in the Stovall case. There is no
evidence that Cupo ever mentioned the lawsuit to anyone or that
he knew the plaintiff was assisting Stovall. Plaintiff does not
argue otherwise. For this additional reason, the plaintiff's
causation argument fails. See Krouse v. Am. Sterilizer Co., 126
F.3d 494, 505 (3d Cir. 1997) (finding no causal link to
establish retaliation because there was no evidence that
defendants were aware of plaintiff's protected activity).

### 2. Grazioli's denial of plaintiff's request for sick leave injury benefits

For similar reasons, the Court finds that the evidence does
not support a reasonable inference that the denial of the
plaintiff's request for sick leave reimbursement was
retaliatory. The Court agrees with the plaintiff that a
reasonable juror could find that the denial of sick leave
reimbursement was materially adverse. Three months' sick leave
payment is not an insubstantial sum, and withholding of

29

reimbursement, even four years after an incident, may still cause a financial hardship serious enough to deter a reasonable employee from complaining about an employer's discriminatory practices. See Diggs v. Potter, 700 F. Supp. 2d 20, 43 (D.D.C. 2010) (denial of request for three hours of sick leave "may well constitute an adverse or materially adverse action."). The cases cited by the defendant are inapposite. This was not a situation where an employee knew her request "would be temporarily denied but ultimately granted." Semsroth v. City of Wichita, 555 F.3d 1182, 1186 (10th Cir. 2009). Grazioli's decision to deny sick leave injury reimbursement was not due to a clerical error, nor did Grazioli take corrective action on his own initiative. See id.; Despanie v. Henderson, 32 Fed. Appx. 390, 392 (9th Cir. 2002) (finding no adverse action because denial of employee's sick leave injury pay was in error and was corrected once employer received adequate documentation). Grazioli had always opposed the plaintiff's reimbursement request; when the plaintiff appealed to the Civil Service Commission, he wrote a letter supporting the denial. (Ex. N, at 1-2.) The plaintiff received payment a year and a half later, not because the employer changed his mind, but because the Civil Service Commission reversed the denial.

Although denial of sick leave injury benefits is deemed

materially adverse, no reasonable jury would be able to find a causal link between the plaintiff's protected activity and the adverse conduct. The eight month delay between the plaintiff's deposition in the Stovall matter and denial does not raise an inference of causation. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing cases where passage of three and four months between the protected activity and adverse action was insufficient, by itself, to establish a causal connection); LeBoon, 503 F.3d at 233 (three-month delay between protected activity and adverse action, without more, cannot create an inference of causation). In addition, the record does not provide any evidence to suggest that Grazioli was aware of Dicks-Kee's protected activity in the fall of 2008. As the head of Human Resources, Grazioli likely knew of Stovall's lawsuit, but nothing suggests that he knew that Dicks-Kee had provided support for Stovall's case.

Moreover, the defendant has provided a legitimate explanation for the denial which the plaintiff has failed to rebut. Grazioli testified that he believed Dicks-Kee had a preexisting illness because of existing heart problems, and any injury caused by aggravation of that preexisting condition was not compensable under § 4A:6-1.6(c)(2) of the New Jersey

31

Administrative Code.[5] Additionally, Grazioli's letter to the
Civil Service Commission noted that the two doctors' reports did
not "clearly establish[]" that the injury was work-related, as
required under N.J.A.C. § 4A:6-1.6(c)(3). Dr. DePace had
determined that Dicks-Kee's heart attack was precipitated by
workplace stress, but Dr. Meshkov had concluded that there was
no "significant causal relationship" between the two.

Dr. Meshkov is a cardiologist who examined Ms. Dicks-Kee on
February 28, 2006, including an electrocardiogram, a personal
interview, and a review of her medical records. (Ex. N [Docket
Item 19-17] at 8-10.) Dr. Meshkov reviewed the circumstances of
her prior health and her myocardial infarction that occurred on
July 8, 2004, as well as EKG and stress test results from
August, 2004. Id. He traced plaintiff's coronary artery disease

---

[5] At the time, the provision under the New Jersey Administrative
Code stated, in part,
> (c) The disability must be due to an injury or illness
> resulting from the employment.
> . . . 2. Preexisting illnesses, diseases and
> conditions aggravated by a work related accident or
> condition of employment are not compensable when such
> aggravation was reasonably foreseeable.
> 3. Illnesses which are generally not caused by a
> specific work-related accident or condition of
> employment are not compensable except when the claim is
> supported by medical documentation that clearly
> establishes that the illness was caused by a work related
> accident or condition of employment.
> N.J.A.C. § 4A:6-1.6(c) (2008).

32

to her history of cigarette smoking, and he also opined that "[t]he role of chronic stress in her coronary artery disease is questionable at best." Id. He noted that her infarction was the product of "a total occlusion [blockage] in the mid-left anterior descending coronary artery," for which she was treated in July, 2004 with the implantation of a coronary stent that reopened that blood vessel. Id. Dr. Meshkov had the impression that she returned to a stable condition with no signs or symptoms of heart failure by the time of her 2006 examination.

The plaintiff argues that the Civil Service Commission's reversal of Grazioli's denial on the law shows pretext, since Grazioli "should have been aware of the law in this area." (Pl. Br. 12.) But as the Third Circuit has made clear, "[t]o discredit the employer's proffered reason, [] the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). Grazioli's decision to deny reimbursement may have been incorrect, but that alone does not indicate pretext. Grazioli's denial of benefits was indeed supported by the medical opinion of Dr. Meshkov, whose 2006 report was attached (together with Dr. Pace's contrary findings)

33

to Grazioli's letter of September 4, 2009 denying the plaintiff's sick leave injury appeal. (Ex. N [Docket Item 19-17].) The plaintiff must point to evidence which would allow the factfinder to infer that retaliation was a motivating cause of Grazioli's decision, or point out weaknesses, implausibilities, or inconsistences in his reasoning. The plaintiff has done neither.[6] There is no evidence that Grazioli's reliance on Dr. Meshkov's opinion was pretexual or implausible. In relying upon a cardiologist's medical opinion, based on personal examination and testing, regarding the complicated subject of medical causation, Grazioli's decision, even if later reversed by the Civil Service Commission, which placed greater weight on Dr. DePace's report and the plaintiff's favorable Workers Compensation award, cannot be shown to be a pretext for retaliation. In other words, the evidence does not give rise to a reasonable inference that Grazioli's reliance on Dr. Meshkov's opinion was a pretext for retaliation.

> **3. Wiesemann's denial of plaintiff's requests for voluntary furlough**

---

[6] The plaintiff suggests that the year-long period of time it took for Grazioli to deny her request was suspicious. However, the plaintiff's own testimony indicates that the tardiness was not due to Grazioli at all. The plaintiff had communicated with someone else from Human Resources about her sick leave injury payment "for over a year" before Grazioli was copied on emails. (Dicks-Kee Dep., at 148:21-149:1.)

The defendant argues that the denial of plaintiff's request for voluntary furlough in August 2010 is not properly before this Court because the incident was not included in the plaintiff's EEOC complaint filed March 29, 2010. (Def. Br. 37-38.) Before an employee may file suit in federal court under Title VII, she must exhaust administrative remedies by filing a complaint with the EEOC. The scope of the federal court action is "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976). The "relevant test" in determining whether the plaintiff has exhausted her administrative remedies "is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984). The defendant contends that because the Charge of Discrimination with the EEOC was filed in March 2010 and included only incidents which occurred before that date, the furlough denial, which was never investigated by the EEOC, cannot be counted. (See Pl. Br. 38; Ex. Q, at 3-4.)[7]

_____

[7] In its motion for summary judgment, the defendant argues that the plaintiff has not exhausted her administrative remedies with the EEO with respect to this particular incident. In its reply, the defendant makes a slightly different argument: that the

The Third Circuit case Waiters v. Parsons, supra, is informative. In Waiters, the appellant filed a formal complaint of retaliation with the EEOC alleging that she was being discriminated against in retaliation for having filed an earlier informal sex discrimination complaint. The EEOC investigated her claim but never took action in the case. Over two years later, the appellant was fired from her position, and she subsequently filed a complaint in the district court alleging that the firing was due to her earlier complaint with the EEOC. Waiters, 729 F.2d at 235-36. The Third Circuit reversed the district court's finding that the plaintiff had not exhausted her administrative remedies. The Court held that the firing was fairly within the scope of the EEOC investigation even though different officials were alleged to be responsible for the alleged discriminatory acts, more than thirty months had passed between the formal complaint and the discharge, and the retaliatory act was of a different nature. Id. at 238.

---

claim of retaliation based on the denials of voluntary furlough should be dismissed for being untimely. (Def. Reply Br. 10-11 (arguing that continuing violations doctrine does not apply to actions based on discrete acts).) Because this argument is raised only in defendant's reply and the plaintiff has had no opportunity to respond to this point, the Court will decline to consider it and will only address defendant's exhaustion argument. Bayer AG v. Schein Pharm., Inc., 129 F. Supp. 2d 705, 716 (D.N.J. 2001).

The Court agrees with the plaintiff that she is not barred from including the denial of furlough requests in this action, and the Court will consider it. Although the denial of furlough was a discrete incident, the core grievance is exactly the same – retaliation for supporting Stovall's discrimination suit. Moreover, Wiesemann, who was responsible for denying her furlough request, had already been named in the EEOC complaint. The plaintiff also suggested in her EEOC complaint that there was a pattern of retaliatory actions. This claim was therefore fairly part of the overall conduct the EEOC was investigating. Waiters, 729 F.2d at 238; see also Hicks v. ABT Assoc. Inc., 572 F.2d 960, 965 (3d Cir. 1978) (finding that sex discrimination claim in civil case was reasonably within the scope of the EEOC's original investigation of race discrimination and retaliation and noting that "the scope of the original [EEOC] charge should be liberally construed.").

Nevertheless, the Court finds that the record does not support a prima facie case of retaliation. Wiesemann denied the plaintiff's request for voluntary furlough in August 2010, nearly two years after the plaintiff participated in the Stovall case. Adverse actions taken more than 20 months after the protected activity "suggests, by itself, no causality at all." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001). And

37

nothing at all in the record suggests that Wiesemann's conduct was connected to the plaintiff's actions in the Stovall case.

The defendant has also given a legitimate, non-retaliatory explanation for the furlough denial. Both Wiesemann and Cupo testified that the furlough policy had recently changed. To avoid unexpected gaps in coverage, employees were no longer allowed to request unspecific furlough days in the manner plaintiff had just done. Thus, the plaintiff's supervisor was not willing to pre-approve 28 days of intermittent leave on unspecified dates spread over a four-month period, but indicated that plaintiff could be pre-approved for specific dates if she would make such requests as needed. The plaintiff argues that applying the policy to her was "unreasonable" because her main responsibility was to turn in work on a specified day each month, and it therefore "did not matter what days she worked" because "there was no need to have someone perform her duties" when she was out. (Def. Br. 3.) That the policy did not make sense to plaintiff given her specific duties at work does not suggest that Wiesemann's decision to abide by the policy was pretextual. Because no reasonable jury would be able to find a causal link between the plaintiff's protected activity and the denial of furlough, and alternately because the defendant has put forth a legitimate reason for the denial which plaintiff

38

cannot rebut, the Court will grant summary judgment.

**V. CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment. The accompanying Order will be entered.


<u>    December 23, 2014    </u>                    <u>    s/ Jerome B. Simandle    </u>
Date                                                       JEROME B. SIMANDLE
                                                           Chief U.S. District Judge